# United States Court of Appeals
## For the First Circuit

No. 09-2135

UNITED STATES OF AMERICA,

Appellee,

v.

RAMÓN DELLOSANTOS, a/k/a RAMÓN DELOSANTOS, a/k/a
RAMÓN DELASSANTOS, a/k/a RAMÓN SANTOS, a/k/a MONSTRITO,

Defendant, Appellant.

No. 09-2670

UNITED STATES OF AMERICA,

Appellee,

v.

RICHARD W. SZPYT, a/k/a ZIP,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Stahl, and Howard,
Circuit Judges.

James S. Hewes, for appellant Dellosantos.
Mary A. Davis, with whom Tisdale & Davis. P.A., was on brief
for appellant Szpyt.

Margaret D. McGaughey, Appellate Chief, with whom Thomas E. Delahanty II, United States Attorney, were on brief for appellee.

—————————————

August 16, 2011

—————————————

**TORRUELLA**, **Circuit Judge**.  On October 22, 2008, appellants Ramón Dellosantos and Richard W. Szpyt (collectively "the Defendants"), together with sixteen other individuals,[1] were charged in a multiple-count superseding indictment.  Count 1 alleged that all individuals (including the Defendants), in violation of 21 U.S.C. §§ 841(a)(1), 846, "in the District of Maine and elsewhere . . . knowingly and intentionally conspired with one another and with others . . . to commit offenses against the United States, namely, distribution and possession with intent to distribute controlled substances, including 5 kilograms or more of cocaine, and marijuana, and did aid and abet such conduct."  A trial followed, in which a jury found Szpyt and Dellosantos guilty of the conduct charged in Count 1.  Szpyt and Dellosantos appealed.[2]

Because we find that the evidence at trial against both Dellosantos and Szpyt prejudicially varied from the charge in Count 1 of the indictment, we vacate their convictions.[3]

---

[1]  The other defendants were Robert L. Sanborn, James E. Weston, Lee P. Chase, Sherwood K. Jordan, Andre T. Charron, Lara M. Sanborn, Robert M. Boothby, Daniel A. Guarino, Zachary Deveau, Kelley Monahan, Walter D. Towle, Jr., Robert A. Bouthot, Bruce Hill, Michael Gochie, Michael A. Martin, and Cynthia A. Moore.

[2]  A third defendant, Sherwood K. Jordan, was also tried with Szpyt and Dellosantos, but Jordan has not appealed his conviction.

[3]  This conclusion makes it unnecessary for us to address the other issues raised by Dellosantos and Szpyt in their appeals.

## I. **Facts and Background**

We review the evidence and all the reasonable inferences that arise therefrom in the light most favorable to the verdict. See United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006).

In presenting its case, the government relied in part on cooperating witnesses. Plinio Vizcaíno, testifying pursuant to a plea agreement, testified extensively against Dellosantos. Vizcaíno admitted that from 2004 to 2007 he distributed cocaine to a handful of individuals, including Dellosantos,[4] in Lawrence and Haverhill, Massachusetts. Over the course of several years, Vizcaíno supplied Dellosantos with cocaine ranging in quantity from 125 grams to several kilograms at a time. Vizcaíno also identified his own and Dellosantos' voice in multiple recorded telephone calls, which included discussions about cocaine. Vizcaíno testified that Dellosantos had told him that he resold some of the cocaine to "hippies" who rode motorcycles in New Hampshire and Maine.

The government's primary cooperating witness was Robert L. Sanborn, who also testified pursuant to a plea agreement. Sanborn's testimony was generally focused on drug distribution in Maine and he did not directly implicate Dellosantos in any illegal activity. Sanborn admitted that he had been a vice-president and

---

[4] Vizcaíno apparently knew Dellosantos as "José Ramón", and in his testimony he refers to Dellosantos as "José Ramón".

"enforcer" of a motorcycle gang known as the "Iron Horsemen," and that Szpyt had been the president of the gang's Maine chapter, which consisted of roughly ten to fifteen members. Sanborn also explained that Szpyt owned the Iron Horsemen clubhouse in Old Orchard Beach, Maine. Despite his leadership position in the gang, however, Szpyt lived outside of Maine, in Haverhill, Massachusetts.

Sanborn testified that in March 2005 he began selling cocaine, which he purchased from James E. Weston, a fellow member of the Iron Horsemen, who was in turn supplied by Szpyt. After a few months of this distribution scheme, Sanborn and Szpyt eliminated Weston as a middleman and began dealing directly with each other. Although Sanborn occasionally received cocaine from other sources, this arrangement between Szpyt and Sanborn continued until Sanborn ceased distributing cocaine in late 2007 or early 2008 following his arrest.

Sanborn also admitted that in the late summer or early fall of 2005 he began distributing marijuana in addition to cocaine. There is no evidence that Sanborn consulted with or received approval from Szpyt when he started to distribute marijuana, or at any point thereafter. Sanborn's first source for marijuana was Carl Demarco, but, in early 2006, Sanborn began receiving his marijuana from Lee P. Chase, whom he had known "for years over the bikes." Chase, in turn, obtained the marijuana from an individual named Danny Boivin. Sanborn testified that in 2006

he started selling marijuana to Sherwood K. Jordan on a regular basis, ten pounds at a time. On a couple of occasions, however, there was a reversal of roles, and Sanborn would buy a supply of marijuana from Jordan, "anywhere from 10 to 20" pounds. Sanborn also admitted to selling (approximately every two weeks) anywhere from eight to ten pounds of marijuana to Charlie Green, a fellow member of the Iron Horsemen. Green generally received his marijuana from a different gang member, Robert A. Bouthot, but turned to Sanborn when Bouthot ran out of his supply.

Sanborn testified in detail about his cocaine purchases from Szpyt, who Sanborn said was also supplying cocaine to other members of the Iron Horsemen. During his testimony, Sanborn explained the meaning of several recorded telephone calls. These calls included conversations between Sanborn and Szpyt about cocaine transactions, conversations between Sanborn and Chase or Jordan about marijuana transactions (none of which mentioned either Dellosantos or Szpyt), and conversations in which Sanborn discusses selling drugs to and collecting payments from customers.

Sanborn testified that he had around twenty customers. Some of these customers only purchased marijuana, some only purchased cocaine, and some purchased both. Sanborn explained that his "lifelong friend," Walter D. Towle, Jr., assisted him with both the marijuana and cocaine operations. At times, people would visit Sanborn's garage for various drug transactions, which were

-6-

conducted with varying amounts of discretion depending on who was present. Szpyt would sometimes deliver cocaine to Sanborn at this same garage, and on other occasions Sanborn, or someone on his behalf, would travel to Massachusetts to pick up the cocaine from Szpyt.

Sanborn testified that he would at times purchase cocaine using proceeds from his marijuana sales, and vice versa. Sanborn also admitted that, with the help of his wife, he maintained ledgers to reflect all of his drug transactions that were done on credit. He started this practice after a dispute with Szpyt over the payment of $12,000, which Sanborn ended up paying because he did not keep adequate records of his nefarious dealings.

Sanborn asserted that both his marijuana and cocaine activities ceased in January 2008, a few months after he was arrested.

The government also called a handful of other cooperating witnesses.[5] In essence, these witnesses corroborated Sanborn's testimony, within their area of knowledge and participation, about the distribution of cocaine and marijuana. None of them implicated either Dellosantos or Szpyt in marijuana transactions. For example, Towle confirmed his involvement in Sanborn's operations,

---

[5] These other cooperating witnesses included the following co-defendants, who pleaded guilty to the conspiracy charge in Count 1: Lara Sanborn, Walter D. Towle, Jr., Lee P. Chase, Daniel A. Guarino and Andre T. Charron.

which he said included traveling with Sanborn, on roughly ten occasions, to Haverhill, Massachusetts, to pick up cocaine from Szpyt. Notably, Lara Sanborn (Robert Sanborn's wife) testified that she was especially careful to record -- in the aforementioned ledgers -- her husband's cocaine transactions with Szpyt, because Szpyt tended to argue over them. The ledgers demonstrated that Sanborn paid his cocaine debt to Szpyt by transferring cash and other items, such as motorcycles and cars. However, other than one occasion where Sanborn reduced $750 from his cocaine debt by paying Szpyt with half a pound of marijuana, Sanborn's drug ledgers did not connect either Dellosantos or Szpyt with Sanborn's marijuana distribution. Furthermore, neither these cooperating witnesses nor any of the recorded conversations introduced at trial connected Szpyt or Dellosantos to the marijuana distribution. In fact, with regards to Dellosantos, none of these witnesses acknowledged ever having met, seen, or known his name.

In addition to cooperating witnesses, the government called a handful of law enforcement officers, including Brian T. Tully, Mark Tully,[6] Corey Sweatt, and Michael Hayes. Mark Tully, a special agent with the Drug Enforcement Administration ("DEA"), testified that in October 2006 he was contacted by DEA agents investigating a drug trafficking organization operating in the Atlanta area. These agents told Mark Tully, who was assigned to

---

[6] Brian Tully and Mark Tully are brothers.

the DEA's Boston office at the time, that they had intercepted calls involving an individual in Massachusetts who turned out to be Vizcaíno. Mark Tully and other agents began an investigation, which resulted in the arrest of around fifteen individuals, including Vizcaíno, and the seizure of seventeen kilograms of cocaine.

Brian Tully, also a special agent with the DEA, testified about his involvement in the investigation of Robert Sanborn and others for drug trafficking. During his testimony, he recounted a series of events that occurred on September 12, 2007. On that date, Brian Tully observed Dellosantos, seated in a white van parked in front of Szpyt's residence in Haverhill, talking to Szpyt who was standing by his window. After Dellosantos departed the area, a surveilling agent asked the Massachusetts State Police to stop the van. As Dellosantos' vehicle was stopped on the side of the road, Brian Tully, who was observing the stop, noticed Szpyt drive past the location on two or three occasions. Walter Hanley, a sergeant with the Massachusetts State Police, eventually searched Dellosantos' vehicle and found a total of $6,000 in cash from both the van's center console and Dellosantos' person.[7] Brian Tully was

_____

[7] Both Sanborns acknowledged that one intercepted call, Call 2567 on September 3, 2007, reflected Sanborn's instruction to his wife, Lara Sanborn, to give Szpyt $5,000 toward a cocaine balance, and enter the transaction in the ledger. The ledger in fact shows two different entries for $5,000 on two different dates that month, one on September 3 and the other on September 19. Although Sanborn testified that he could not remember which entry reflected the

in turn informed about this discovery, as well as Dellosantos' claim that he had receipts accounting for the cash as the proceeds of sales from his legitimate business. In an effort to protect the secrecy of the wiretap, Brian Tully instructed Hanley to return the money and let Dellosantos go.

Brian Tully also testified about an intercepted phone call that occurred around the time of this traffic stop. As or shortly after Dellosantos was pulled over, the DEA recorded Szpyt calling his daughter and telling her to hide a "baggie." On the recording, Szpyt's daughter explains that she could only find "pot," to which Szpyt responds, "right, a bag, a big bag, right? . . . Grab that and hide it."

Toward the end of his testimony, Brian Tully identified Dellosantos and Szpyt as the voices in Calls 1800 and 1801, which were recorded the day that Sanborn was arrested, September 21,

---

payment referred to in Call 2567, Lara Sanborn confirmed that she had in fact paid Szpyt on September 3 and that the September 3 entry reflected the payment discussed in this call. The ledger also suggests that Sanborn either paid Szpyt or otherwise reduced his cocaine debt by $8,000 on September 10 and $4,000 on September 14.

The government asserts that the jury could have reasonably inferred that the cash that the police found on Dellosantos on September 12 was the "drug proceeds that Sanborn had recently delivered to Szpyt." We disagree. Although it is certainly conceivable that the money found in Dellosantos' possession was money Sanborn had given to Szpyt in the previous couple of weeks, we cannot see how a reasonable jury examining this evidence could determine -- without speculating -- that the $6,000 found on Dellosantos consisted, in whole or in part, of money that Sanborn paid Szpyt.

-10-

2007.  Among other things, Szpyt told Dellosantos "bad news going on up here right now."  The government also introduced Call 2026, recorded three days later on September 24, between Szpyt and Dellosantos.[8]  In the call, Szpyt asked Dellosantos to come over to his house and expressed apprehension about talking on the phone.  Szpyt nonetheless proceeded to recount to Dellosantos the story of Sanborn's recent arrest.  Their conversation included the following exchange:

> Szpyt:  Yes, whoa.  Fucking, one of my fucking idiot brothers got fucking popped up there.
>
> Dellosantos:  Oh yeah.
>
> Szpyt:  Yeah, fucking idiot was doing, fucking weed deal or some fucking stupid thing.
>
> Dellosantos:  Fucking knuckle head.
>
> Szpyt:  Yeah, what a fucking knuckle head. You know what I mean? I said, what are you doing fucking around with that, you know what I mean? . . .
>
> Dellosantos: Oh my god.
>
> Szpyt: I didn't know.  I can only police my fucking guys so much.  Know what I mean.
>
> Dellosantos: Yeah, yeah, yeah.
>
> Szpyt:  So I didn't know.  I got no control, you know what I mean, they are all men . . . . I got no control over them . . . .  He got caught with twenty pounds.

_____

[8]  Brian Tully did not identify the voices on the phone call, but the government asserts the call was between Dellosantos and Szpyt, the transcript of the call indicates it was between Dellosantos and Szpyt, and the Defendants do not seem to contest this fact.

> Dellosantos:  Oh my god. . . .

Szpyt also mentioned the possible criminal sanctions Sanborn faced:

> Szpyt:  Then they raided the house and I guess they found a - some white powder substance in the garage . . . . Yeah.
>
> Dellosantos:  Wow. . . .
>
> Szpyt:  I mean, up in Maine, weed is nothing. Twenty pounds is a slap in the hand . . . . You probably get five years . . . . Or three years . . . . [B]ut that white stuff up there, they take that serious.
>
> Dellosantos:  Yeah, they don't fuck around with that shit, huh?
>
> Szpyt:  Yeah, they don't fuck around with that . . . .

In this call, Szpyt also recited specific details about the circumstances surrounding the arrest and subsequent search of Sanborn's home.

Corey Sweatt, a deputy sheriff in York County, Maine, also testified about the events of September 21, 2007.  On that date, Sweatt was called to assist with the ongoing DEA investigation by stopping a vehicle on Route 111 in Lyman, Maine.  The driver turned out to be Sanborn, who invited Sweatt to conduct a search of the vehicle.  This search, conducted by other officers who arrived at the scene, yielded a clear plastic bag with white powder, as well as "[a] large amount of marijuana."

Michael Hayes, a deputy sergeant in the York County Sheriff's Office and member of the DEA's task force, testified

about the execution of a search warrant at Sanborn's garage and residence on September 21. Hayes testified that he found cocaine next to a tool box in Sanborn's garage and two scales on top of the tool box, one of which had cocaine residue on it. Hayes also testified about his examination of the records of a gym in Methuen, Massachusetts, which showed visits by Vizcaíno and Dellosantos at the same time on several occasions.

After the government rested, Dellosantos and Szpyt moved for acquittal pursuant to Federal Rule of Criminal Procedure 29. The district court denied the motions, and the defendants went on to present several witnesses whose testimony we need not recount here. After the defendants rested, Dellosantos and Szpyt renewed their Rule 29 motions, which were again denied.

Ultimately, the jury found Szpyt and Dellosantos (and Jordan) guilty of conspiracy to distribute and possess with intent to distribute cocaine and marijuana (Count 1). The jury also found Szpyt guilty of four counts (Counts 18, 19, 32, and 39) of using a communication facility to facilitate the commission of the conspiracy set forth in Count 1.[9]

---

[9] Szpyt does not challenge these last four convictions on any basis independent from his challenge to Count 1. Count 40, which also charged Szpyt with using a communication facility to facilitate the commission of the conspiracy, was dropped during trial on the government's motion. Count 7, which charged Szpyt with unlawful possession of firearms, was also dismissed on the government's motion.

## II. Discussion

Both Dellosantos and Szpyt assert that the evidence presented at trial was insufficient to support their convictions under Count 1 and challenge the district court's denial of their motions for judgment of acquittal. The Defendants' challenges to the sufficiency of the evidence and to the denial of their motions for judgment of acquittal raise a single issue and thus we apply the traditional sufficiency of the evidence standard to these claims. See United States v. Hernández, 218 F.3d 58, 64 n.4 (1st Cir. 2000). Because each Defendant moved for a judgment of acquittal at the close of evidence, we review their sufficiency claims de novo. See United States v. Rivera Calderón, 578 F.3d 78, 88 (1st Cir. 2009).

We begin our discussion by briefly sketching the relevant law of conspiracy.

### A. Conspiracy Law

A criminal conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. See United States v. King, 627 F.3d 641, 651 (7th Cir. 2010). The agreement is the sine qua non of a conspiracy, and this "element is not supplied by mere knowledge of an illegal activity . . ., let alone by mere association with other conspirators or mere presence at the scene of the conspiratorial deeds." United States v. Zafiro, 945 F.2d 881, 888 (7th Cir. 1991); see also United States v. Pérez-González,

445 F.3d 39, 49 (1st Cir. 2006) (same). "[I]t is therefore essential to determine what kind of agreement or understanding existed as to each defendant." United States v. Rivera-Santiago, 872 F.2d 1073, 1079 (1st Cir. 1989) (quoting United States v. Glenn, 828 F.2d 855, 857 (1st Cir. 1987)) (internal quotation mark omitted). The agreement need not, however, "be express, [and] may consist of no more than a tacit understanding." United States v. Morillo, 158 F.3d 18, 23 (1st Cir. 1998) (quoting United States v. Echeverri, 982 F.2d 675, 679 (1st Cir. 1993)) (internal quotation marks omitted).

Thus, in order to sustain a conviction for conspiracy under 21 U.S.C. § 846, the evidence must show that (1) a conspiracy existed, (2) the defendant had knowledge of the conspiracy, and (3) the defendant knowingly and voluntarily participated in the conspiracy. United States v. Portalla, 496 F.3d 23, 26 (1st Cir. 2007); Morillo, 158 F.3d at 23 (quoting United States v. Gómez-Pabón, 911 F.2d 847, 852 (1st Cir. 1990)). Under the third element, the evidence must establish that the defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy. Portalla, 496 F.3d at 26.

**B. The Defendants' Challenge to the Sufficiency of the Evidence**

The Defendants deny that they joined the single overarching conspiracy to distribute both cocaine and marijuana charged in Count 1. Rather, they assert, the government introduced

-15-

evidence suggesting only that they participated in a conspiracy to distribute cocaine, and not the Maine-based conspiracy to distribute <u>both</u> cocaine <u>and</u> marijuana that was charged in the indictment. In short, although neither Defendant uses the term "variance," their challenge here essentially amounts to a contention that there was a variance between the charge in the indictment and the evidence introduced at trial.

"'A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment.'" <u>United States</u> v. <u>Mangual-Santiago</u>, 562 F.3d 411, 421 (1st Cir. 2009) (quoting <u>United States</u> v. <u>Yelaun</u>, 541 F.3d 415, 419 (1st Cir. 2008)), <u>cert. denied</u>, 130 S. Ct. 293 (2009). A variance alone, however, does not necessitate disturbing a conviction; rather, "[a] variance is grounds for reversal only if it is prejudicial . . . ." <u>Id.</u> (quoting <u>United States</u> v. <u>DeCicco</u>, 439 F.3d 36, 47 (1st Cir. 2006)); <u>see also</u> <u>Glenn</u>, 828 F.2d at 858. "Put differently, 'so long as the statutory violation remains the same [as that alleged in the indictment], the jury can convict even if the facts are somewhat different than charged -- so long as the difference does not cause unfair prejudice.'" <u>United States</u> v. <u>Wihbey</u>, 75 F.3d 761, 774 (1st Cir. 1996) (quoting <u>United States</u> v. <u>Twitty</u>, 72 F.3d 228, 231 (1st Cir. 1995)).

As will be explained below, we hold that evidence against Dellosantos and Szpyt varied from the conspiracy specified in the indictment, and that variance caused each of them to suffer unfair prejudice. Accordingly, the district court erred in denying Dellosantos' and Szpyt's Rule 29 motions to acquit.

### 1. The Variance

"When . . . a defendant asserts a claim of variance premised on the notion that multiple conspiracies existed and that his activities were not part of the charged conspiracy, the initial question . . . is one of evidentiary sufficiency." United States v. Pérez-Ruiz, 353 F.3d 1, 7 (1st Cir. 2003); see also United States v. Niemi, 579 F.3d 123, 127 (1st Cir. 2009) ("Whether evidence shows one or many conspiracies is a question of fact for the jury and is reviewed only for sufficiency of the evidence."), cert. denied, 130 S. Ct. 1912 (2010). In reviewing for sufficiency of the evidence, "'we examine the evidence -- direct and circumstantial -- as well as all plausible inferences drawn therefrom, in the light most favorable to the verdict, and determine whether a rational fact finder could conclude beyond a reasonable doubt that the defendant committed the charged crime.'" Niemi, 579 F.3d at 127 (quoting United States v. Wyatt, 561 F.3d 49, 54 (1st Cir. 2009)).

In determining whether a prejudicial variance exists in the instant case, we first discuss the legal principles that govern

whether criminal activity constitutes multiple conspiracies, as opposed to a single conspiracy. Next, we address whether the evidence in the case at hand supported a finding of a single overarching conspiracy, encompassing both Defendants and all the relevant nefarious conduct, to distribute both cocaine and marijuana. After concluding that the evidence did not support such a conclusion, but rather that the evidence established at least two distinct conspiracies, we analyze whether the evidence was sufficient for a jury to have found the Defendants guilty of joining either of the two conspiracies that were actually proven by the government and, if so, we then determine whether the variance (between the conspiracy charged and the conspiracy for which there was sufficient evidence that the Defendants actually joined) unfairly prejudiced the Defendants.[10]

---

[10] This analytical approach is consistent with the framework set forth in previous cases for analyzing when a variance between the conspiracy charged and the conspiracy proven constitutes reversible error:

> (1) Is the evidence sufficient to permit a jury to find the (express or tacit) agreement that the indictment charges? (2) If not, is [the evidence] sufficient to permit a jury, under a proper set of instructions, to convict the defendant of a related, similar conspiracy? (3) If so [i.e., the answer to (2) is yes], does the variance affect the defendant's substantial rights or does the difference between the charged conspiracy and the conspiracy proved amount to "harmless error"?

Wihbey, 75 F.3d at 773 (second alteration in original) (quoting Glenn, 828 F.2d at 858).

## 2. The Evidence Showed Multiple Conspiracies

"In determining whether the evidence supports the existence of a single conspiracy, we ultimately look at the totality of the evidence." Manqual-Santiago, 562 F.3d at 421. There are three factors this court has found particularly helpful in evaluating the evidence: "'(1) the existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants.'" Id. (quoting United States v. Sánchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008), cert. denied, 129 S. Ct. 953 (2009)).

The first factor, common goal, "is given 'wide breadth.'" Id. (quoting Sánchez-Badillo, 540 F.3d at 29). For example, "[a] goal of selling cocaine for profit or furthering the distribution of cocaine" may be sufficient evidence of a common goal. Id. (quoting United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999)) (internal quotation marks omitted). The second factor, interdependence, concerns whether "'the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.'" Id. at 422 (quoting Portela, 167 F.3d at 695). More specifically, "'Each individual must think the aspects of the venture interdependent, and each defendant's state of mind, and not his mere participation in some branch of the venture, is key.'" Id. (quoting Portela, 167 F.3d at 695). We have explained the significance of this factor:

> [K]nown interdependence . . . makes it reasonable to speak of a tacit understanding

-19-

> between the distributor and others upon whose unlawful acts the distributor knows his own success likely depends. When such interdependence is missing, when the distributor is indifferent to the purposes of others in the enterprise — say, other distributors — the tacit understanding does not exist.

Glenn, 828 F.2d at 857-58 (internal citation omitted); see also Sánchez-Badillo, 540 F.3d at 29. Finally, the third factor, overlap among the participants, "is satisfied by the pervasive involvement of a single core conspirator, or hub character." Mangual-Santiago, 562 F.3d at 422 (internal quotation marks omitted). In considering these three factors, we must remember that the existence of a single conspiracy does not require the participants to know of all the other participants, understand all the details of the conspiracy, or participate in each aspect of the conspiracy. Id.; Sánchez-Badillo, 540 F.3d at 29.

In Sánchez-Badillo, we applied these three factors in rejecting the contention of two co-defendants that they were not part of a single conspiracy. 540 F.3d 24. In that case, the co-defendants were convicted of conspiracy to distribute heroin, cocaine, cocaine base, and marijuana. Id. at 27. One defendant managed heroin and marijuana sales from the "lower point" in a public housing project, and the other defendant managed cocaine and marijuana sales from the "upper point" in the same housing project. Id. at 28. Both locations, however, were "owned" by a boss, to whom both defendants paid "rent." Id. at 27-28. This court

-20-

affirmed the convictions. First, the evidence showed a common goal of "serving [the boss'] illicit interests." Id. at 29. Second, a reasonable jury could have found interdependence from the following: the boss' "iron-fisted" control over the housing project suggested that the defendants tacitly agreed to join the boss' organization, the boss' representative worked at the lower point, two dealers worked at both locations, one of the defendants served as an enforcer for the boss, and on one occasion "participants in the two points were arrested together and aided by participants in the lower point." Id. at 29-30. Third, the evidence demonstrated an overlap among the participants, as the boss was a "hub." Id. at 30-31.

In Glenn, on the other hand, we reversed a defendant's conviction based on our conclusion that the evidence was insufficient to prove that he had joined the single conspiracy charged in the indictment. 828 F.2d 855. Glenn involved a defendant convicted of conspiring to import and possess marijuana and hashish. Id. at 857. The evidence showed that a group of core conspirators met repeatedly to develop plans to smuggle marijuana from Thailand and hashish from Pakistan, fraudulently borrowed $10 million to finance the operation, bought a boat for hashish smuggling but used it for the marijuana smuggling, and purchased a landing area where eight tons of marijuana were unloaded. Id. at 858. The evidence also showed that both the core conspirators and

-21-

the defendant thought of the defendant as a subsidiary figure, the defendant's duties only involved hashish, and the defendant was generally only present at meetings about hashish. Id. Although the defendant was aware of the marijuana smuggling and present at a few meetings in which marijuana was discussed, we concluded that the record did not support a conclusion that the defendant "thought the two ventures interdependent, in the sense that the success of the one might have facilitated completion of the other." Id. at 859. Consequently, the evidence was "insufficient to show that [the defendant] expressly or tacitly agreed to do more than to import and possess Pakistani hashish."[11] Id.

In the instant case, looking at the totality of the evidence, we conclude there was insufficient evidence to support the finding of a single conspiracy. Rather, the evidence pointed to at least two distinct conspiracies: (1) the Massachusetts-based Vizcaíno-Dellosantos-Szpyt conspiracy to distribute cocaine, and (2) the Maine-based Sanborn-centered conspiracy to distribute both cocaine and marijuana (whose participants included, inter alia, Robert L. Sanborn, Lara Sanborn and Walter D. Towle, Jr.).[12]

---

[11] The court also concluded that the evidence against a co-defendant varied from the charges in the indictment, though it ultimately affirmed the co-defendant's conviction because the variance did not prejudice the co-defendant. See Glenn, 828 F.2d at 860-61.

[12] For purposes of this appeal, it is unnecessary to determine whether the Boivin-Chase-Sanborn-Jordan marijuana distribution chain constituted a third conspiracy that was distinct from the

-22-

First, the two conspiracies had materially different goals, at least in part. Although they both sought to sell the cocaine that traveled through the Vizcaíno-Dellosantos-Szpyt-Sanborn supply chain, the Sanborn-centered conspiracy included a second, equally important objective that the other conspiracy lacked: the distribution of marijuana. Nor did the ventures share the objective of serving a particular organization or boss. Cf. Sánchez-Badillo, 540 F.3d at 29.

Second, even assuming without deciding that Dellosantos and Szpyt knew of Sanborn's marijuana distribution operation (a fact contested by the Defendants),[13] we find that the two conspiracies lacked sufficient interdependence, particularly

Sanborn-centered cocaine and marijuana distribution conspiracy.

[13] In support of its contention that the Defendants knew of Sanborn's marijuana distribution operation, the government claims, that, on September 12, 2007, Dellosantos was recorded asking Szpyt for "green paint" for a friend, which the government asserts was a reference to marijuana. In his reply brief, "Dellosantos disputes any knowledge or understanding of the phrase 'green paint.'"

As an initial matter, we note an inconsistency between the government's depiction of this conversation and the record. Exhibit 2C, which the government cites on appeal, includes a call summary of the relevant conversation and that call summary indicates Szpyt was asking Dellosantos about the green paint, not vice versa.

Nevertheless, even if we accept the government's characterization of the meaning of "green paint," this conversation does not materially impact our analysis. Even if the September 12 discussion suggests that Dellosantos actually sold marijuana to Szpyt or an associate of Szpyt's, there was no other evidence and the government does not contend that Dellosantos provided marijuana for the venture in Maine.

-23-

considering that the participants' states of mind are the "key" to this inquiry. See Mangual-Santiago, 562 F.3d at 422. In this regard, although the evidence showed that Szpyt and Dellosantos "participated in some branch" (supplying cocaine) of the Sanborn-centered operation, cf. id., nothing was presented to the jury to suggest that either of them believed that the success of their cocaine distribution operation likely depended on Sanborn's marijuana distribution venture. See Glenn, 828 F.2d at 857-58.

For example, the evidence did not establish a situation where an individual or group had an "iron-fisted control" over the two distribution schemes. Cf. Sánchez-Badillo, 540 F.3d at 30. In addition, Sanborn used different suppliers for his marijuana distribution (namely, Demarco and Chase), and there was no evidence that either Szpyt or Dellosantos relied upon the success of Sanborn's marijuana distribution in order to sell their cocaine. Cf. Mangual-Santiago, 562 F.3d at 422. Rather, as discussed below, the record indicates that the Defendants were indifferent to Sanborn's marijuana distribution scheme. See Glenn, 828 F.2d at 858 (noting that a tacit understanding does not exist when the distributor is indifferent to the purposes of others in the enterprise). In fact, there was little evidence to suggest that Dellosantos even knew about the marijuana operation until Szpyt told him of Sanborn's arrest.

The government presented at trial a plethora of evidence providing detailed descriptions of Szpyt's relationship with Sanborn and the latter's marijuana distribution emporium. This evidence established, _inter alia_, that Szpyt and Sanborn communicated constantly, as the two were fellow Iron Horsemen who spent much time together (both in Massachusetts and Maine) at Iron Horsemen parties and handling cocaine distribution. Yet, there was no evidence suggesting that the two ever discussed Sanborn's marijuana distribution operation. Thus, the evidence strongly suggested that Szpyt was only interested in his own unlawful ends (i.e., distributing cocaine) and was indifferent with regards to Sanborn's other unlawful activities. _See_ _Blumenthal_ v. _United States_, 332 U.S. 539, 558 (1947) (noting that separate conspiracies may be found when defendants have distinct ends, when they have no interest in others' unlawful activities and when they do not aid others in conducting those activities). The success of Szpyt's and Dellosantos' cocaine distribution operation was no more dependent on the success of Sanborn's marijuana distribution operation than it was on the success of Sanborn's garage or any other (legal or illegal) income-producing venture devised by Sanborn that might have enabled him to pay off his cocaine debt to Szpyt. No evidence was presented suggesting that either Szpyt or Dellosantos understood the relationship differently.

-25-

This weakness in the government's case is highlighted by its heavy reliance on Call 2026 -- the conversation between Dellosantos and Szpyt about Sanborn's arrest -- as "[p]erhaps the most damning evidence" that Defendants understood their cocaine distribution operation to have been interdependent with Sanborn's marijuana distribution.  Even viewing this conversation in the light most favorable to the verdict, Szpyt was merely informing Dellosantos about a fellow Iron Horsemen (and cocaine customer) who was caught committing a serious crime.  It was expected for both Szpyt and Dellosantos to have been very interested in this story, since, although Sanborn was caught doing a "weed deal," a search of his home and an investigation of his other activities (e.g., cocaine distribution) might lead law enforcement officials to the Defendants.  However, this concern over Sanborn's ability to avoid detection, by itself, does not suggest that the Defendants believed that they had an interest in every income-producing unlawful venture that Sanborn might have gotten himself into (in this case, marijuana distribution).  We cannot see how this conversation suggests that either Szpyt or Dellosantos believed that their cocaine distribution was interdependent with Sanborn's marijuana operation.  In fact, a recording of the transcript of Call 2026 (see ante at pp. 11-12) shows the opposite of what the government claims, for Szpyt is complaining that he did not know about

-26-

Sanborn's marijuana trafficking: "I didn't know.  I can only police my fucking guys so much. . . . I got no control."

Third and finally, any evidence of overlap between the two conspiracies was insufficient to outweigh the lack of interdependence.  To be sure, controlled substances that were distributed in both conspiracies traveled through Sanborn.  However, there was no evidence Sanborn had any interactions with Dellosantos or Vizcaíno or was even aware of their existence, aside from his general knowledge that Szpyt obtained cocaine from a few suppliers, one of whom Sanborn believed to be Hispanic.  Nor was there any evidence that Dellosantos specifically knew he supplied Sanborn with cocaine.  In short, Sanborn was not the type of "hub" character that frequently exists in cases where this court has found significant overlap and an overarching conspiracy.

Perhaps this case is best understood if we think of Sanborn as a drug supermarket owner, who sold different products, cocaine and marijuana, rather than bananas and tomatoes, from different distributors: cocaine from the Vizcaíno-Dellosantos-Szpyt chain and marijuana from the Demarco and Boivin-Chase suppliers.  Were we actually considering such fruit distribution chains in the context of an actual supermarket, we would be hard put to argue that the intersection of those two separate fruit product distribution chains would be of any legal significance as far as somehow making the members of the two separate chains overall

business partners. Neither would it be reasonable to argue that merely distributing tomatoes to the supermarket, by itself, would make the tomato distributor a partner in the supermarket's overall business of selling bananas and other foods. When we transfer this bucolic scenario to the present case, we can perceive no legally significant difference in the outcome. The Vizcaíno-Dellosantos-Szpyt criminal conspiracy to distribute cocaine was a different criminal enterprise than the Boivin-Chase-Sanborn-Jordan marijuana enterprise, with different products, a different source of supply, different goals, and a different history. Similarly, distributing cocaine (rather than tomatoes) to Sanborn's drug supermarket does not, by itself, make Vizcaíno, Dellosantos and Szpyt partners in Sanborn's drug supermarket business of distributing cocaine and marijuana.

In sum, we conclude that the evidence did not support a finding of a single overarching conspiracy covering all the relevant drug dealing. With this conclusion in mind, we turn to whether the evidence sufficed to prove that the Defendants joined either of the two conspiracies that were actually proven by the government and, if so, we then determine whether the variance (between the conspiracy charged and the conspiracy for which there was sufficient evidence that the Defendants actually joined) unfairly prejudiced the Defendants.

### 3. The Defendants did not Join the Conspiracy Specified in the Indictment

As previously mentioned, the indictment charged the Defendants with participation in a <u>single</u> Maine-based conspiracy to distribute and possess with intent to distribute <u>both</u> cocaine <u>and</u> marijuana. The evidence, however, established the existence of at least <u>two distinct</u> conspiracies: (1) the Massachusetts-based Vizcaíno-Dellosantos-Szpyt conspiracy to distribute cocaine, and (2) the Maine-based Sanborn-centered conspiracy to distribute <u>both</u> cocaine <u>and</u> marijuana.

Mindful of this variance, we find that the Defendants' convictions cannot stand for two reasons. First, we find that the evidence was insufficient to support a verdict that either Szpyt or Dellosantos knowingly and voluntarily joined the Sanborn-centered conspiracy to distribute <u>both</u> cocaine <u>and</u> marijuana. Second, assuming without deciding that the evidence was sufficient to permit a jury to find the Defendants guilty of joining the Vizcaíno-Dellosantos-Szpyt conspiracy to distribute cocaine, we find that the Defendants would be unfairly prejudiced by the difference between the conspiracy specified in the indictment and the Vizcaíno-Dellosantos-Szpyt conspiracy to distribute cocaine. These two findings are discussed separately in the following sections.

### a. The Evidence was Insufficient to Establish that the Defendants Joined the Sanborn-centered Conspiracy

While the indictment charged the Defendants with joining a single overarching conspiracy to distribute <u>both</u> cocaine <u>and</u> marijuana, the evidence proved at least two distinct conspiracies, i.e., the Vizcaíno-Dellosantos-Szpyt conspiracy to distribute cocaine and the Sanborn-centered conspiracy to distribute <u>both</u> cocaine <u>and</u> marijuana. Under our previously mentioned framework, if we were to find sufficient evidence for a jury to find the Defendants guilty of joining the <u>Sanborn-centered conspiracy</u>, then the question would arise as to whether the variance between the charged conspiracy and the Sanborn-centered conspiracy was harmless. <u>See</u> <u>Wihbey</u>, 75 F.3d at 773 (quoting <u>Glenn</u>, 828 F.2d at 858). We, however, do not have to answer this question conclusively, given that, as discussed below, we find that the evidence was insufficient for a rational factfinder to conclude beyond a reasonable doubt that the Defendants joined the Sanborn-centered conspiracy.

In order to establish the crime of conspiracy, the government must prove, among other things, "the defendant's knowing and voluntary participation in the conspiracy," which in turn "requires that the government establish [defendant's] intention to join the conspiracy and to effectuate the objects of the conspiracy." <u>Portalla</u>, 496 F.3d at 26. As discussed below, the

evidence presented to the jury did not establish beyond a reasonable doubt that either Szpyt or Dellosantos knowingly and voluntarily intended to join the Sanborn-centered conspiracy and to effectuate its objects.

The mere fact that Sanborn chose to diversify his illegal activities by venturing out into the marijuana distribution business and agreed to form a multi-object conspiracy with other individuals to sell and distribute both cocaine and marijuana does not, by itself, make the Defendants a party to such a conspiracy, even if the Defendants had knowledge of the same. See Zafiro, 945 F.2d at 888; see also United States v. Melchor-López, 627 F.2d 886, 891 (9th Cir. 1980) ("[M]ere association with members of a conspiracy, the existence of an opportunity to join a conspiracy, or simple knowledge, approval of, or acquiescence in the object or purpose of the conspiracy . . . is not sufficient to make one a conspirator."); United States v. Collins, 552 F.2d 243, 245 (8th Cir. 1977) ("Knowledge of the existence or acquiescence in a conspiracy does not serve to render one a part of the conspiracy."). Rather, as discussed previously, the evidence suggested that the Defendants were indifferent to Sanborn's marijuana operations, and therefore it was not reasonable to conclude that the Defendants agreed to join the Sanborn-centered conspiracy to distribute both cocaine and marijuana. Just as the hashish smuggler in Glenn was aware that his co-conspirators were

-31-

involved in marijuana smuggling but was himself uninterested in marijuana, see 828 F.2d at 857-59, Szpyt and Dellosantos, both cocaine distributors, were allegedly aware of Sanborn's involvement in marijuana distribution but were themselves uninterested in the marijuana operations. Furthermore, there was no evidence that either Szpyt or Dellosantos profited from marijuana.

In addition, we are unpersuaded by the Government's proposal that the fact that Szpyt spent significant time in Maine and assumed a leadership role in the Iron Horsemen suggested that he intended to join the Sanborn-centered conspiracy to distribute both cocaine and marijuana. There is no evidence that Szpyt's role in the Iron Horsemen was in any way connected to Sanborn's marijuana network. In fact, contrary to what the government claims, the recorded conversation between Dellosantos and Szpyt regarding Sanborn's marijuana arrest, in which Szpyt is complaining to Dellosantos of Sanborn's "fucking stupidity," in fact suggests Szpyt's lack of participation in Sanborn's marijuana activities: "[O]ne of my . . . idiot brothers got . . . popped up there. . . . [D]oing . . . fucking weed deal or some fucking stupid thing. . . . I didn't know. I can only police my fucking guys so much. . . . I got no control . . . they are all men . . . . He got caught with twenty pounds [of marijuana]."[14]

---

[14] Although our standard of review is deferential, it is not meaningless. We are still required to decide whether the evidence, viewed in the light most favorable to the prosecution and "drawing

The government also points to certain other snippets of evidence regarding Szpyt that neither individually nor jointly establish beyond a reasonable doubt that he intended to join the Sanborn-centered conspiracy to distribute both cocaine and marijuana.

First, the government points to the previously mentioned occasion where Sanborn reduced $750 from his cocaine debt to Szpyt by paying him with half a pound of marijuana. We note, however, that this singular exchange of marijuana for a cocaine debt does not factually or legally make Szpyt a member of the Sanborn-centered conspiracy, any more than if Sanborn had paid Szpyt in cash or with a sack of Maine potatoes. That single payment with marijuana was merely a barter of goods, not the joining of Szpyt into the Sanborn-centered conspiracy.[15]

all plausible inferences therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime." United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008) (emphasis added). Thus, we respectfully disagree with Judge Howard's suggestion, infra at 45, that, despite the overall lack of evidence, this conversation (viewed in the light most favorable to the government) was sufficient to prove beyond a reasonable doubt that Szpyt intended to both join the Sanborn-centered conspiracy and effectuate its objects. See Portalla, 496 F.3d at 26.

[15] In his concurring/dissenting opinion, Judge Howard cites United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993) to support his proposition that this single transaction proved beyond a reasonable doubt that Szpyt tacitly agreed to enter a conspiracy involving, inter alia, marijuana distribution. We respectfully disagree. Moran notes that "even a single sale for resale, embroidered with evidence suggesting a joint undertaking between buyer and seller, could suffice [to find a conspiracy]." 984 F.2d at 1303. In the

Second, the government points to the recorded conversation between Szpyt and his daughter indicating that, at one point, Szpyt possessed a "big" bag of marijuana. Again, we are unpersuaded. In the first place, this occurred in the United States, where trafficking in marijuana is endemic. Thus, the marijuana could just as well have been from a source in Massachusetts, or elsewhere, and it may have been for Szpyt's personal use.[16] Moreover, there is no evidence as to what was the amount in the "big" bag, or more importantly for our purposes, whether it was in any way connected to the Sanborn-centered conspiracy based in Maine.

Finally, we note that the government presented an abundance of evidence of Sanborn's marijuana network, including direct testimony of Sanborn's marijuana emporium and a selection of hundreds of telephone conversations (from a pool of thousands of calls intercepted by the government) involving hours of intercepted communications, which memorialized the marijuana dealings attributed by the government to the Sanborn-centered conspiracy. It is quite significant that none of these recordings (dealing with

---

present case, however, there was no evidence that the marijuana exchanged in this single barter transaction was for resale, and the transaction was not "embroidered with evidence" suggesting that Szpyt intended to both join the Sanborn-centered conspiracy and effectuate its objects. Cf. id. To the contrary, as previously mentioned, the evidence indicated that Szpyt was indifferent to Sanborn's marijuana distribution operation.

[16] The record showed that Szpyt smoked marijuana.

the Sanborn-centered conspiracy) even randomly mention either Dellosantos or Szpyt. Furthermore, there were numerous recorded telephone calls between Szpyt and Sanborn dealing with cocaine and in none is there even an inkling that the Defendants were part of the marijuana distribution scheme that Sanborn independently organized and directed.[17]

In sum, we conclude that the evidence was insufficient for a rational factfinder to conclude beyond a reasonable doubt that either Dellosantos or Szpyt joined the Sanborn-centered conspiracy. In light of this conclusion, we now turn to whether the Defendants' convictions can nonetheless stand based on a finding that the Defendants joined the other conspiracy proven by the government, i.e., the Vizcaíno-Dellosantos-Szpyt conspiracy to distribute cocaine.

> **b. The Defendants were Unfairly Prejudiced by the Variance Between the Conspiracy Specified in the Indictment and the Vizcaíno-Dellosantos-Szpyt Conspiracy**

"We review de novo the question whether a variance affected a defendant's substantial rights." Wihbey, 75 F.3d at 774.

Although the indictment charged a single overarching conspiracy to distribute both cocaine and marijuana, the evidence

---

[17] The only exception to this is the aforementioned conversation in which Szpyt emphatically tells Dellosantos of Sanborn's arrest for his marijuana activities, of which Szpyt claims lack of control.

established the existence of at least two distinct conspiracies: the Maine-based Sanborn-centered conspiracy to distribute both cocaine and marijuana and the Massachusetts-based Vizcaíno-Dellosantos-Szpyt conspiracy to distribute cocaine. As discussed in the preceding section, the evidence was insufficient to support a finding that the Defendants joined the Sanborn-centered conspiracy. On the other hand, the evidence was arguably sufficient to support a finding that the Defendants joined the other conspiracy proven by the government, i.e., the Vizcaíno-Dellosantos-Szpyt conspiracy. Furthermore, because the statutory violation for joining the Vizcaíno-Dellosantos-Szpyt conspiracy remains the same as that alleged in the indictment (i.e., 21 U.S.C. § 846), the jury, under a proper set of instructions, could arguably have convicted the Defendants of participating in the Vizcaíno-Dellosantos-Szpyt conspiracy so long as the difference between the conspiracy specified in the indictment and the Vizcaíno-Dellosantos-Szpyt conspiracy "d[id] not cause unfair prejudice." Wihbey, 75 F.3d at 773. Nevertheless, for the reasons stated below, we conclude that the Defendants were unfairly prejudiced by the difference between the conspiracy specified in Count 1 and the Vizcaíno-Dellosantos-Szpyt conspiracy, and, therefore, vacate their convictions. See id. (noting that, where there is a variance, a jury cannot convict if the difference causes unfair prejudice).

We have previously recognized at least three ways in which a variance might "affect the substantial rights" of the accused. Id. at 774 (citing United States v. Sutherland, 929 F.2d 765, 772-73 (1st Cir. 1991)).

> First, a defendant may receive inadequate notice of the charge against him and thus be taken by surprise at trial. Second, a defendant may be twice subject to prosecution for the same offense. Third, a defendant may be prejudiced by "evidentiary spillover": the "transference of guilt" to a defendant involved in one conspiracy from evidence incriminating defendants in another conspiracy in which the particular defendant was not involved.

Id.

In the instant case, the Defendants (and their counsel) were, at the very least, deprived of adequate notice of the charges against them, and they were therefore limited in their ability to prepare a defense at trial. Specifically, the Defendants were forced to defend against an allegation that they joined a Maine-based conspiracy to distribute both cocaine and marijuana, when in fact the government introduced evidence suggesting that the Defendants joined (with different co-conspirators) a Massachusetts-based conspiracy to distribute cocaine, i.e., the Vizcaíno-Dellosantos-Szpyt conspiracy. See Yelaun, 541 F.3d at 419 (noting that a variance may prejudice a defendant by, among other things, "undermining the defendant's right to have sufficient knowledge of the charge against him to prepare an effective defense and avoid

-37-

surprise at trial" (internal quotation marks omitted)). Accordingly, we find that the difference between the conspiracy specified in the indictment and the Vizcaíno-Dellosantos-Szpyt conspiracy unfairly prejudiced the Defendants.

In addition, there should be little question that the jury's decision to find the Defendants guilty of joining the conspiracy specified in Count 1 (to distribute both cocaine and marijuana) was influenced by the plethora of evidence implicating the other sixteen indicted co-defendants (including Sanborn) in a conspiracy involving marijuana. As previously mentioned, this evidence included direct testimony from various co-defendants -- who pled guilty to the conspiracy in Count 1 -- and a selection of hundreds of telephone conversations (from a pool of thousands of calls intercepted by the government) involving hours of intercepted communications, which memorialized the marijuana dealings of the other sixteen individuals indicted under Count 1. Thus, under the guise of its single conspiracy theory, the government subjected the Defendants to voluminous testimony relating to unconnected crimes in which they took no part. This situation created a pervasive risk of "evidentiary spillover," where the jury might have unfairly transferred to the Defendants the guilt relating to the other sixteen indicted individuals. Specifically, there was a pervasive risk that such transference of guilt might have led the jury to find the Defendants guilty of joining the conspiracy specified in

-38-

Count 1 (dealing with both cocaine and marijuana), despite the fact that the evidence was insufficient to support such a finding.

In sum, we find that the variance between the conspiracy specified in the indictment and the evidence at trial was unfairly prejudicial to both Defendants. The evidence established at least two conspiracies, (1) the Sanborn-centered conspiracy, and (2) the Vizcaíno-Dellosantos-Szpyt conspiracy. With regards to the first conspiracy (i.e., the Sanborn-centered conspiracy), the evidence was insufficient to support a finding that the Defendants joined the same. In addition, although the evidence was arguably sufficient to support a finding that the Defendants joined the second conspiracy proven (i.e., the Vizcaíno-Dellosantos-Szpyt conspiracy), we find that the variance between the conspiracy specified in the indictment and the Vizcaíno-Dellosantos-Szpyt conspiracy unfairly prejudiced the Defendants. Accordingly, we vacate both Dellosantos' and Szpyt's convictions under Count 1.[18]

---

[18] The government argues in a cursory manner that, even if the evidence did not establish that the Defendants agreed to join a single conspiracy to distribute both marijuana and cocaine -- as charged in the indictment -- Griffin v. United States, 502 U.S. 46 (1991) requires us to affirm the Defendants' convictions insofar as the evidence was sufficient to connect the Defendants to a conspiracy to distribute only cocaine (i.e., to the Vizcaíno-Dellosantos-Szpyt conspiracy). This argument is waived in light of the government's perfunctory treatment of Griffin and lack of developed argumentation. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). But even if it were not waived, the argument would still fail as it is not supported by Griffin.

In Griffin, the defendant was indicted for conspiring to defraud a federal government agency in violation of 18 U.S.C. § 371, by

### III.  Conclusion

Based on the above, we conclude that the district court erred in denying Dellosantos and Szpyt's Rule 29 motions. Accordingly, Dellosantos' conviction on Count 1 of the indictment is vacated.  Similarly, Szpyt's conviction on Count 1 and all charges based thereon are also vacated.

**Vacated**.


**"Concurring and Dissenting opinion follows"**

---

joining a single conspiracy with two objects.  The jury returned a general guilty verdict that did not specify whether the jury had convicted the defendant of participating in one objective of the charged conspiracy (for which there was sufficient proof) or for participating in the other objective, for which (as the government conceded) there was not sufficient evidence.  The Supreme Court affirmed, holding that a general guilty verdict on a dual-object single conspiracy count need not be set aside merely because the defendant was not implicated in one of the objects of the charged conspiracy, where the evidence was sufficient to find that the defendant participated in the other object of such conspiracy. Id. at 48-52.  On the other hand, the important point as far as this case is concerned is that the defendant in Griffin had agreed to the dual-object single conspiracy that was charged, thus a finding that the defendant had participated in one of this conspiracy's objectives was enough to sustain the conviction.  In the present case, however, the government failed to prove beyond a reasonable doubt that Dellosantos and Szpyt agreed to join the conspiracy that was charged.

Thus, Griffin did not abrogate the well settled principle that, where a single conspiracy is charged and multiple conspiracies are proven, the government must prove that the charged conspiracy existed and that defendants agreed to join that conspiracy, and not some other conspiracy.  See, e.g., United States v. Trainor, 477 F.3d 24, 35 n.20 (1st Cir. 2007) (noting that jury instructions explaining this principle were proper).

**HOWARD**, <u>Circuit Judge</u> **(concurring in part and dissenting in part)**. The majority's framework for deciding these cases relies on circuit precedent that I doubt can be reconciled with the usual mode, after <u>Griffin</u> v. <u>United States</u>, 502 U.S. 46 (1991), of analyzing convictions on indictments alleging multiple-object conspiracies. Even under my respected colleagues' framework, there was sufficient evidence to convict Szpyt if not Dellosantos.

**I.**

In <u>Griffin</u>, a defendant was charged in a single count with conspiracy to defraud the government by means of two objects. <u>Id.</u> at 47. At trial the government linked the defendant to one object but not the other. <u>Id.</u> at 48. The jury convicted in a general guilty verdict. <u>Id.</u> The Supreme Court affirmed the conviction: It held that a general guilty verdict on a dual-object conspiracy charge must stand as long as the evidence is adequate to support conviction as to one of those objects, even if the evidence is inadequate as to the other. <u>Id.</u> at 48-52.

We have applied <u>Griffin</u> and upheld general guilty verdicts in single-count, multiple-object conspiracies in a variety of contexts. For example, in <u>United States</u> v. <u>Mitchell</u>, the defendant challenged his conviction under a single count for conspiracy to violate (1) the arson statute, and (2) the wire-fraud statute. 85 F.3d 800, 809 (1st Cir. 1996). Among other things, the defendant argued that there was insufficient evidence to prove

-41-

the wire-fraud object of the conspiracy. Id. at 811. We rejected that argument, however, based on Griffin and the defendant's failure to contest the sufficiency of the evidence as to the other object of the conspiracy. Id.; see also United States v. Gerhard, 615 F.3d 7, 30 (1st Cir. 2010), cert. denied sub nom. Riley v. United States, 131 S. Ct. 1536 (2011); United States v. Capozzi, 486 F.3d 711, 718-19 (1st Cir. 2007).

Similarly, the indictment here charged a single conspiracy to violate a narcotics statute by means of two objects: (1) distributing cocaine; and (2) distributing marijuana. As I read Griffin and our case law, it seems to me that the government's burden at trial was to prove that a conspiracy to distribute narcotics existed, and to tie each defendant to the agreement to distribute one or more of the drugs involved in that conspiracy; that is, either cocaine or marijuana or both. At least that is how several other circuits have read Griffin in cases like this one,[19] and this approach flows logically from the settled law that a general verdict on a multiple-count indictment will stand even if

_____

[19] United States v. Calle, 120 F.3d 43, 44 (5th Cir. 1997), cert. denied 523 U.S. 1012 (1998); United States v. Henry, 71 F. Appx. 493, 499-500 (6th Cir. 2003) (per curiam), cert. denied sub nom. Rosenboro v. United States, 540 U.S. 1134 (2004); United States v. Vaziri, 164 F.3d 556, 566-67 (10th Cir. 1999), cert. denied sub nom. Quarterman v. United States, 533 U.S. 923 (2001); United States v. Barnes, 158 F.3d 662, 672 (2d Cir. 1998); accord United States v. Banks, 10 F.3d 1044, 1054-55 (4th Cir. 1993) (same, but without citing Griffin), cert. denied sub nom. Blow v. United States, 511 U.S. 1090 (1994).

some counts were not proved and that charges leveled in the conjunctive need only be proved in the disjunctive.[20]

But the government has to make the argument to benefit from it. Here, the government does little more than cite the relevant authority. It makes no meaningful attempt to explain how that authority applies in these cases, its effect (if any) on variance analysis, or whether the jury charge (and the government's failure to object) limits its application in these cases, not to mention potential issues in sentencing based on a general guilty verdict when multiple drugs are involved. Answers to those questions are not obvious, especially in light of our precedent relied on by the majority. And we cannot do the government's

---

[20] The majority attempts to distinguish Griffin as follows: "the defendant in Griffin had agreed to the dual-object single conspiracy that was charged, thus a finding that the defendant had participated in one of this conspiracy's objectives was enough to sustain the conviction." Ante, at 39 n.18. But that statement merely begs the question. In Griffin, the proof failed to establish that the defendant was even aware of one of the two objects of the conspiracy, see 502 U.S. at 48, a critical fact that the lower court's decision had made crystal clear. United States v. Beverly, 913 F.2d 337, 348, 360 (7th Cir. 1990), aff'd, Griffin, 502 U.S. 46 (recognizing that there was "no proof that [Ms. Griffin] knew Mr. Beverly was a drug dealer" but affirming her conviction anyway because she participated in the conspiracy's other object). Thus, the defendant could not have agreed to both objects of the dual-object single conspiracy in Griffin. Moreover, our precedent applying Griffin has never required that a defendant agree to both objects in order to sustain a conspiracy conviction. Indeed, in Mitchell, this court rejected the defendant's plaint that "the Government was allowed to argue a 'grab bag' of theories and ask the jury to guess as to which agreement Mitchell contemplated" because under Griffin "the jury could find Mitchell guilty on Count I if the government proved either of the objects of the conspiracy." Mitchell, 85 F.3d at 810 (emphasis supplied).

homework, even if the government may be on to something.  United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## II.

That issue aside, my colleagues reach the wrong result in any event, at least for Szpyt.  In Szpyt's brief, he flatly admits to the cocaine scheme; and the evidence adduced at trial showed that he was not only aware of -- but directly benefitted from -- the marijuana scheme.  An entry in Sanborn's ledger reflected that Szpyt accepted a half-pound of marijuana in lieu of $750 toward the balance of Sanborn's cocaine debt.  That transaction was confirmed at trial by Sanborn's wife.  The majority says that this one-time payment of a half-pound of marijuana is "merely a barter of goods." Ante, at 33.  I find that characterization peculiar in a narcotics case.  But in any event the majority's criticism misses the point: a single transaction in the context of other evidence suggesting a joint undertaking can prove tacit agreement.  United States v. Moran, 984 F.2d 1299, 1303 (1st Cir. 1993).

And here the evidence did suggest that Szpyt played some role in the marijuana undertaking.  For example, in one recorded call, Szpyt relayed to Dellosantos the details of Sanborn's arrest for a "weed deal" and bemoaned that "I can only police my fucking guys so much."  The statement, which the jury easily could have concluded was tongue-in-cheek, implies not only that he knew about marijuana distribution, but also that he exercised at least some

-44-

measure of control over it, although in his view not enough.  The inference makes sense in light of Szpyt's leadership position over gang members distributing marijuana in Maine, and the fact that he owned the clubhouse in Old Orchard Beach where they met.  Even if that is not the only inference the jury could have drawn, it is certainly plausible and at this stage we must draw all such inferences in favor of guilt.  United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008).

On top of this, the evidence indicated that Szpyt possessed some quantity of marijuana.  Following a meeting between Szpyt and Dellosantos, police acting in cooperation with federal authorities pulled over Dellosantos' van for a traffic violation. The officers observed Szpyt drive past the stopped vehicle several times.  In a recorded call at about the same time, Szpyt called home and exhorted his daughter to hide the "big bag" of "pot."  The majority says that Szpyt's cache of marijuana could have been for his personal consumption.  Perhaps they are right.  But viewing all the evidence together (and not each piece separately and in isolation as the majority does), and in light of the deference that our precedent requires, I believe that the jury was free, although not compelled, to convict Szpyt.

So I respectfully dissent in case no. 09-2670.  But I have sincere doubts that the result in either case is correct.